## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE NO. |
| NATASHA NATILE FRANCE, | 1:19-cr-0103-TCB-AJB-02 |
| Defendant. | |

## <u>UNITED STATES MAGISTRATE JUDGE'S ORDER AND<br>NON-FINAL REPORT AND RECOMMENDATION</u>

Before the Court are Defendant Natasha Natile France's motion to suppress evidence, [Doc. 121], related to the warrantless search of five parcel post packages and her cell phone; her motion to suppress evidence obtained from the search of the cell phone and brief in support, [Doc. 135]; and her brief and amended brief in support of the motion to suppress the search of the parcel post packages. [Docs. 152, 153]. For the following reasons, the undersigned **RECOMMENDS** that the motion to suppress the warrantless search of five parcel post packages be **DENIED**. The Court will conduct an evidentiary hearing to develop a sufficient record before issuing a Report and Recommendation as to that motion.

## I.      <u>INTRODUCTION</u>

France is charged along with others with conspiring to make false and

fictitious written statements to a licensed firearms dealer in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 371 (Count One); making false and fictitious statements to a firearms dealer in connection with the acquisition of firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 2 (Counts Two through Four); and causing the U.S. Postal Service to not file a shipper's Export Declaration through the Automated Export System by failing to declare that firearms and firearm parts were exported from the United States to the U.S. Virgin Islands, in violation of 13 U.S.C. § 305 and 18 U.S.C. § 2 (Counts Ten and Twelve).[1] [Doc. 1].  After pleading not guilty, France filed the pending motions.

## II.   MOTION TO SUPPRESS EVIDENCE FROM FIVE PARCEL POST PACKAGES

France and her codefendant Shawn Tyson also are charged with federal crimes in the District of the Virgin Islands.  *United States v. Tyson*, No. 19-CR-0009 (D.V.I.).  On April 12, 2019, France participated in an evidentiary hearing in that case before United States District Judge Curtis V. Gomez.  [Doc. 153-1 (hereinafter "T_")].  No further evidentiary hearing in this District has been requested, nor does the Court conclude that one is warranted.  Thus, the record of law enforcement actions with regard to the parcel packages is complete and the

---

[1]     The indictment also contained a forfeiture provision.  [Doc. 1 at 13].

2

Court can use the evidence presented at the hearing before Judge Gomez in recommending a resolution to France's pending motion to suppress.

### A.   EVIDENCE PRESENTED BEFORE JUDGE GOMEZ

The evidence at the hearing before Judge Gomez reveals that on October 23, 2018, Customs and Border Patrol ("CBP") Officer Jerry Quetel was assigned to the cargo division, which inspects all international mail coming into St. Thomas, V.I. T12.   On that date, he came across a mail parcel addressed to Tyson, and the shipping label stated that the contents of the package was "Merchandise" / "Roni plastic kit."   The package originated in Israel and was addressed to Tyson at St. Thomas Jet Center, North Cyril King Airport, Lindberg Bay, Charlotte Amalie, St. Thomas, Virgin Islands. T13-15.   Quetel knew that a Roni kit is a type of gun accessory that gives a small handgun the look, feel, and handle of an assault weapon. T15-16.   He Googled Tyson's name and discovered information about a prior firearms case.   T27. As a result, he opened the package to determine if it was mislabeled or it purported to contain firearms-related merchandise, and he discovered three Roni kits.   T16-17.   Quetel contacted his supervisor, who instructed him to contact Homeland Security (HSI), because that agency prosecutes crimes.   T17.   He turned the package over to HSI.   T18.

On November 14, 2018, one of Quetel's colleagues, CBP Officer Bryan McCoy, was at the main U.S. post office in St. Thomas, and while inspecting mail incoming from the continental United States, he observed a Priority Mail box addressed to Tyson.  T31, 51.  The box was completely sealed.  T50.  He asked fellow CBP Officer Sharissa Smith whether she remembered Tyson's name, and they recalled the package containing Roni kits that Quetel had intercepted.  T31.  They Googled Tyson's name and discovered that he was a convicted felon for trafficking firearms.  *Id.*  When McCoy manipulated the box, he and Smith heard what sounded like metal parts hitting each other.  T55-56. McCoy opened the box (which had Defendant France's name and an Austell, Georgia, return address, [T38-41]), and discovered gun parts for an assault rifle (that is, lower receivers,[2] with obliterated serial numbers).  T31, 32, 56.[3]  The parcel then was x-rayed, which McCoy described as "kind of an archive."  T65.  McCoy and Smith looked for other packages addressed to Tyson and intercepted three more.  T31-32, 60.  These boxes were x-rayed, which disclosed additional weapons and firearm parts.  T60.

---

[2]    A receiver is the lower portion of a firearm and is considered a firearm for purposes of the federal firearms law.  18 U.S.C. § 921(a)(3)(B).

[3]    McCoy was a firearms instructor and therefore was familiar with what firearms look like in a broken-down state.  T31, 54.

That same day, a postal employee delivered to Quetel a domestically-mailed box that was similarly addressed to Tyson.  T17, 23, 24, 32.  Also, McCoy and Smith brought to Quetel's attention the four boxes similarly addressed to Tyson that they located.  T32.  Because one of the four boxes found by McCoy and Smith had been opened and found to contain firearms parts, T26, Quetel x-rayed the package that was mailed domestically, which x-ray revealed metal parts inside that appeared to be firearm slides.  T17-18.  Quetel advised McCoy and Smith of his findings, and transferred that package, unopened, to them.  T18, 20.  They confirmed through x-ray that this package contained weapons and firearm parts.  T61.  Upon opening that box, it was found to contain lower receivers with obliterated serial numbers.  T61. All five packages were seized.  T32.  The officers did not obtain a search warrant before opening or x-raying any of the packages.  T24, 26.

Smith testified that, at the time of the search on November 14, 2018, regulations provided that packages coming into the Virgin Islands, except first-class mail, could be searched upon reasonable suspicion that it contained merchandise or contraband.  T52; *see also* T68.

The five packages were delivered to Eric Oram, a United States Postal Inspector.  T70.  The packages sent from Atlanta were Priority Mail and ranged in

5

weight from 7 lbs. 3 oz. to 11 lbs. 2 oz.  T71-73.  Oram testified that first-class mail,

on the other hand, is comprised of letters, flats, and parcels that do not exceed 13 oz.

T79.[4]  Oram also explained that the package containing the Roni kits was sent from

Israel and arrived in CBP custody in New York, and then transmitted through the

mail to St. Thomas.  T75-76.

ATF Special Agent Gary Dorman, Jr., testified that he came to the Virgin

Islands to execute an arrest warrant upon Tyson.  T84.  Tyson was not at home, and

after gaining consent from a tenant to search the residence for Tyson, Dorman

located a drill press and firearms parts, including a Glock Auto Sear, in the common

areas.[5]  T86-87.  He later obtained a search warrant to search a locked room in the

home as well as to further search the residence, and as a result, firearm parts,

ammunition, and the drill press were seized.  T87.

---

[4]     Oram also testified that first-class and priority mail are priced and delivered differently.  However, both are categorized as "sealed against inspection."  T80.

[5]     An Auto Sear is a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.  ATF Rul. 81-4, 1981-3 A.T.F.Q.B. 78; 26 U.S.C. § 5845(b).

**B.** **JUDGE GOMEZ' OPINION**

On December 11, 2019, Judge Gomez ruled that the November 14, 2018 warrantless searches of the Priority Mail packages between France and Tyson offended the Fourth Amendment, but that the evidence need not be suppressed pursuant to the good-faith exception to the exclusionary rule. *United States v. Tyson*, Crim. No. 2019-09, 2019 WL 6736212 (D.V.I. Dec. 11, 2019). Specifically, Judge Gomez noted that in *United States v. Baxter*, No. CR 2017-24, 2018 WL 6173880 (D.V.I. Nov. 26, 2018),[6] he had found the search of a warrantless package between the continental United States and the Virgin Islands improper, holding that " 'where . . . law enforcement conducts warrantless searches of sealed packages sent from the United States mainland to the United States Virgin Islands, law enforcement runs afoul of the Constitution.' " *Tyson*, 2019 WL 67336212, at *2 (quoting *Baxter*, 2018 WL 6173880 at *17). Finding no material difference between the searches in *Baxter* and *Tyson*, Judge Gomez concluded that the same ruling applied. In so ruling, Judge Gomez distinguished the Third Circuit's decision in *United States v. Hyde*, 37 F.3d 116, 117 (3d Cir. 1994), where the court had held that routine customs searches of persons

---

[6] On February 21, 2020, the Third Circuit reversed Judge Gomez's opinion in *Baxter*. *United States v. Baxter*, 951 F.3d 128 (3d Cir. 2020).

and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment. *Tyson*, 2019 WL 67336212, at *2 (citing *Baxter*, 2018 WL 6173880 at *17). Instead, Judge Gomez concluded that the Third Circuit has never extended that exception to the warrant requirement for items or persons traveling *from* the mainland to the United States Virgin Islands, *id.*, and therefore declined to extend *Hyde* to items transported from the mainland to the Virgin Islands. *Id.* Nonetheless, Judge Gomez applied the good-faith exception, noting that prior to *Baxter*, "this Court appeared to presume that travel of persons and things between the United States Virgin Islands and the United States mainland in either direction and in any circumstance was, for Fourth Amendment purposes, identical to travel between foreign soil and United States sovereign territory." *Id.* at *3 (citations omitted). Judge Gomez issued his *Baxter* decision 12 days before the warrantless search of the Priority Mail packages, and thus the CBP officers were entitled to rely on the previous decisions. *Id.* at *4.

### C.   ARGUMENTS OF THE PARTIES

The Government argues that the fruits of the warrantless searches should not be suppressed on the strength of *Hyde*, which held, based on *United States v. Ramsey*, 431 U.S. 605 (1977), that the border-search exception to the Fourth

Amendment applied to the internal border between the continental United States and the territory of the Virgin Islands.  [Doc. 137 at 2].  It also argues that the decision of another judge in the Virgin Islands, *United States v. Barconey*, No. CR 2017-0011, 2019 WL 137579, at *9-12 (D.V.I. Jan. 8, 2019), where the court applied a balancing test of the government's interests and the right to privacy in concluding that the warrantless search of luggage and effects upon arrival at the airport in St. Croix, V.I., on a flight from Miami was improper (but found the officers' actions protected by the good-faith doctrine), is inconsistent with *Ramsey* and *Hyde*, neither of which employed a balancing test.  [Doc. 137 at 4].  The Government further argues that even if a balancing test is appropriately employed, it has a significant interest in conducting routine customs searches at the border that outweighs any privacy interest in Priority Mail, although recognizing that a warrantless search at the "extended border" might require reasonable suspicion.  [*Id.* at 4-5 & n.2 (citing *United States v. Niver*, 689 F.2d 520, 526 (5th Cir. 1982))].

Finally, the Government urges that if the searches in this case are found to be unlawful, suppression should be avoided by application upon the officers' good-faith reliance upon the federal regulations in effect, namely, 19 C.F.R. §§ 145.1-145.3, which allow for customs officials to conduct a physical inspection upon reasonable suspicion of non-first class mail between the continental United States

and the Virgin Islands for the presence of merchandise or contraband.  [Doc. 137 at 5-6].

In reply, France argues that the Court should employ the balancing test adopted by *Baxter*.  [Doc. 153 at 4-5].  She also argues that the good-faith exception should not apply, in part because the best practices listed in the appendix to 19 C.F.R. § 145 directs CBP officers to x-ray packages first to determine if they contain contraband or merchandise, but in this case, McCoy opened one of the packages before x-raying it.  [Doc. 53 at 5-6].

### D.    <u>DISCUSSION</u>

France's motion is due to be denied because the warrantless search of the packages that she sent from Georgia to Tyson in the Virgin Islands do not offend the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Thus, a search without a warrant is "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).  Evidence seized as the result of an illegal search may not be used by

the Government in a subsequent criminal prosecution.  *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).

It is beyond dispute that mail is subject to Fourth Amendment protection. *See United States v. Jacobsen*, 466 U.S. 109, 114, (1984) (public has legitimate expectation of privacy in letters and sealed packages; warrantless searches of same are presumptively unreasonable); *United States v. Smith*, 39 F.3d 1143, 1144 (11th Cir. 1994); *United States v. Duckett*, 583 F.2d 1309, 1314 (5th Cir. 1978).[7] At the same time, warrantless searches conducted at the international borders of the United States do not violate the Fourth Amendment.  *United States v. Ramsey*, 431 U.S. 606, 620 (1977).  This border-search exception generally provides that routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant.  *See Ramsey*, 431 U.S. at 616-19; *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73(1973); *Carroll v. United States*, 267 U.S. 132, 154 (1925).  Such searches may be conducted at an international border checkpoint or its functional equivalent.  *See Almeida-Sanchez*, 413 U.S. at 272-73.  The border exception applies to incoming

---

[7]Error! Main Document Only.  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

11

mail. *Ramsey*, 431 U.S. at 616-25; *United States v. Pringle*, 576 F.2d 1114, 1117-18 (5th Cir. 1978) (warrantless search by Customs of incoming international mail did not violate Fourth Amendment despite absence of any ground for suspicion). Furthermore, every circuit to consider the issue has held that the border search exception applies to outgoing as well as incoming travelers and, therefore, to outgoing mail as well. *See United States v. Boumelhem*, 339 F.3d 414, 422-23 (6th Cir. 2003); *United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir.1995) ("[W]e join the several other circuit courts which have held that the *Ramsey* border search exception extends to all routine searches at the nation's borders."); *United States v. Ezeiruaku*, 936 F.2d 136, 143 (3d Cir. 1991) ("[T]he traditional rationale for the border search exception applies as well in the outgoing border search context."); *United States v. Udofot*, 711 F.2d 831, 839-40 (8th Cir. 1983); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982) ("Since this was a search at a 'border', of a person leaving the country, there is no need for probable cause, warrants or even suspicion."); *United States v. Ajlouny*, 629 F.2d 830, 834-35 (2d Cir. 1980). The Eleventh Circuit has not decided the issue with regard to outgoing persons or effects generally. *See United States v. Hernandez-Salazar*, 813 F.2d 1126, 1138 (11th Cir. 1987) (without deciding whether the border search exception "applies equally in all respects to incoming and outgoing searches," holding that the Fourth

Amendment "permits warrantless searches of persons and property departing the United States on the basis of reasonable suspicion that a currency reporting violation is occurring").

Neither the Court's own research nor the parties have located an Eleventh Circuit decision on the central issue of this motion—whether a warrant is needed to search mail packages sent from the continental United States to one of its possessions or territories, in this case, the Virgin Islands. In evaluating this issue, first, the Court is not bound by the opinions of the District Judges in the Virgin Islands. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (internal quotation marks omitted). Moreover, the Court is particularly not bound by Judge Gomez's decision in France's case before him since it was based on Judge Gomez's previous *Baxter* decision, and that decision was reversed by the Third Circuit. *See* n.6. And while the Court is not bound by decisions of the Third Circuit, *Minor v. Dugger*, 864 F.2d 124, 126 (11ᵗʰ Cir. 1989) ("Under the established federal legal system the decisions of one circuit are not binding on other circuits."), authority from other circuits of the United States Court of Appeals may be considered for its persuasive value. *Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective Ins. Co. of*

13

*Se.*, 492 Fed. Appx. 16, 19 (11th Cir. Oct 10, 2012) (citing *United States v. Diamond*, 430 F.2d 688, 692 (5th Cir. 1970)); *see also Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 (11th Cir. 2010) ("Because our precedent is relatively sparse in this area, we consider decisions from other circuits as persuasive authority."). The Court concludes that the Third Circuit's decisions in *Hyde* and *Baxter* are persuasive and guide the recommended resolution of France's motion.

In *Hyde*, the Third Circuit held that routine customs searches of person and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment. *Hyde*, 37 F.3d at 176. In reaching its conclusion, the *Hyde* court first discussed the principles underlying the border exception as enunciated in *Ramsey* and *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); foremost, the right of the sovereign to protect itself by stopping and examining persons and property crossing into this country in order to regulate the collection of duties and prevent the introduction of contraband. *Hyde*, 37 F.3d at 119. It then recognized that a sovereign can create a border within its sovereign territory, and to differently treat territory over which it exercises sovereignty, so that "borders between 'incorporated' and 'unincorporated' territory of a sovereign have many of the characteristics of international borders." *Id.* at 120. The court stated that since the

Virgin Islands are an unincorporated territory of the United States, Congress has the authority to make rules and regulations to govern it. *Id.* at 121 (citing *Smith v. Govt. of the Virgin Islands*, 375 F.2d 714[, 718-19] (3d Cir. 1967)).  The *Hyde* court considered the Virgin Islands' status as not materially different than that of Puerto Rico and the Panama Canal Zone as discussed in several Supreme Court cases,[8] and therefore concluded that Congress had the authority to create a customs border between the Virgin Islands and the rest of the United States.  *Hyde*, 37 F.3d at 121.  The court noted that Congress in fact created such a border between the Virgin Islands and the United States after the Virgin Islands were acquired from Denmark in 1917, levying duty rates on goods from the Virgin Islands the same as like articles imported from foreign countries, with the proceeds going to the benefit of the Virgin Islands.  *Id.* (citation omitted).  Furthermore, it noted that Congress authorized customs inspections of travelers from the Virgin Islands to the United

---

[8]    Namely, *Downes v. Bidwell*, 182 U.S. 244 (1901), which the *Hyde* court stated stood for the proposition that since Puerto Rico did not become an integral part of the United States when Spain ceded it to the United States, Congress could impose duties upon its goods free of the constitutional requirement that impost must be uniform throughout the United States, *Hyde*, 37 F.3d at 120 (citing *Downes*, 182 U.S. at 341 (White, J., concurring)); and *David Kaufman & Sons Co. v. Smith*, 216 U.S. 610, 611 (1910), upholding congressional authority to set import duties from the Panama Canal Zone, another U.S. territory at the time, the same as those from foreign nations.  *Hyde*, 37 F.3d at 121.

States, all of which establishes that "since the acquisition of the Virgin Islands, Congress has consistently asserted its authority to impose a border between the Virgin Islands and the rest of the United States for customs purposes and has authorized customs officials to search vessels and goods passing between the Virgin Islands and the rest of the country." *Id.* While the *Hyde* court concluded that the border exception did not apply, it found the rationale of the border-exception cases supported a conclusion that the search at issue was valid. *Id.* at 122. The court reasoned that consistent with Congress' power to regulate commerce with foreign lands, it similarly had broad power to regulate commerce between the United States and its unincorporated territories. *Id.* The *Hyde* court then stated that routine borderless searches without probable cause would appear to be essential to the accomplishment of the objectives of an established customs border as similar searches have universally been recognized to be to the objectives of traditional customs systems at the international borders; "[t]hus, as far as the interests of the sovereign are concerned, we perceive the interest of the United States in warrantless searches without probable cause at this 'internal border' to be little different from its interests in such searches at its international borders." *Id.*

The court then applied the balancing test of *Montoya*, 473 U.S. at 537 ("The permissibility of a particular law enforcement practice is judged by 'balancing its

16

intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests"), and found that the reasonable expectation of privacy in the passengers searched at the airport in that case was not materially greater than that of international passengers, given the longstanding border-type searches between the United States and the Virgin Islands. *Id.* The court also noted that the enactment of 48 U.S.C. § 1561 in 1968, applying the Fourth Amendment to the Virgin Islands, did not undermine the warrantless searches performed under 19 U.S.C. § 1467, which statute established a customs border between the Virgin Islands and the United States, since at the time of § 1561's enactment, the customs border and its concomitant warrantless searches had existed for many years, the customs collected had been for the benefit of the Virgin Islands, and the court found no indication in the legislative history of that latter enactment reflecting that Congress intended to repeal the authority of customs officials to conduct such surveillance. Instead, the court found no inconsistency between the authorization of such searches and the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.* at 122-23.

*Hyde*'s continuing vitality and why its rationale is persuasive to the Court is bolstered by the Third Circuit's most recent decision overruling Judge Gomez in *Baxter*. The facts of *Baxter* are nearly identical to the facts of the present case. In

17

*Baxter*, the defendant sent two Priority Mail packages from South Carolina to St. Thomas, V.I.  The first one was opened without a warrant after drug-detecting canines alerted to it, and a CBP officer discovered ammunition and unassembled firearms.  When the second box arrived a few days later, due to the same names and addresses as on the first box, it was x-rayed and found to contain a gun and ammunition.  Both packages weighed more than 13 ounces.  *Baxter*, 951 F.3d at 129-30 & n.3.  Relying upon *Hyde*, the *Baxter* court concluded that the warrantless searches were reasonable, the directional distinction drawn by Judge Gomez made no material difference, and that the border-search exception applies regardless of the direction of the border crossing.  *Id.* at 134-35.

*Hyde* and *Baxter* also are consistent with analogous binding precedent in the Eleventh Circuit.  Thus, for example, in *United States v. Matthews*, 427 F.2d 992, 995 (5th Cir. 1970), the former Fifth Circuit recognized that the Panama Canal Zone, then a territory of the United States, was considered a foreign country where matters of commerce were concerned.  *Id.* at 994 (citing *Luckenbach S.S. v. United States*, 280 U.S. 173, 177-78 (1930)).  Thus, it is likely that the Eleventh Circuit would conclude that the court would similarly analyze the Virgin Island's relationship with the United States and find the Third Circuit's reasoning applicable.  Further, while in *Hernandez-Salazar* the Eleventh Circuit found it could decide the

18

case without directly deciding the issue, it recognized that every other circuit court had applied the border-search exception to outgoing commodities.  *Hernandez-Salazar*, 813 F.2d at 1137-38 (noting that "[e]very circuit that has considered the question has ruled that the rationales for the 'border exception' apply both to incoming and outgoing persons and instrumentalities" (citations omitted)). Therefore, it is likely that the Eleventh Circuit would afford similar treatment to outgoing parcels delivered in the Virgin Islands.  As a result, the Court applies the rules announced by the Third Circuit in *Hyde* and *Baxter* and concludes that the five parcels containing France's return address and addressed to Tyson in the Virgin Islands that were intercepted by the CBP officers from domestic mail and searched without a warrant without running afoul of the Fourth Amendment.

Even if the warrantless search in this case is found to violate the Fourth Amendment, the Court concludes that suppression is not mandated under the good-faith exception to the exclusionary rule.  The officers acted on the basis of a regulation that permitted the warrantless opening of priority mail delivered from the continental United States to the Virgin Islands.  19 U.S.C. § 145.2(b) ("All mail arriving from outside the Customs territory of the United States which is to be delivered within the Customs territory of the United States and all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin

Islands, is subject to Customs examination, except," for items not relevant here.).[9]

The officers testified before Judge Gomez that they acted in conformity with those

provisions. T68.[10]

In *United States v. Leon*, the Supreme Court explained that exclusion is not

warranted when police act "in objectively reasonable reliance" on a subsequently

---

[9]    As noted by the third Circuit in *Baxter*, 951 F.3d at 136 n.18, the mail in this case, due to its weight qualified as "priority mail," not "first class mail," which is described in USPS Domestic Mail Manual § 101.6.1, or as "sealed letter class mail," described in 19 C.F.R. § 145.1.  By regulation, first class mail and sealed letter class mail are subject to heightened requirements prior to customs inspection.  *See* 19 C.F.R. § 145.3(b), (e).  The packages at issue here did not qualify for the benefit of those heightened protections and therefore were subject to customs inspection under 19 C.F.R. § 145.2.

[10]    To the extent that McCoy opened the first parcel he came across because he believed he had reasonable suspicion that it contained merchandise or contraband, *see* T52, his actions were supported by reasonable suspicion.  Whether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable police officer at the scene and is based on the totality of the circumstances.  *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003).  At the time McCoy opened that parcel, he knew that recently Tyson had received Roni kits, had a prior firearms case, and the box that he first handed sounded like it contained some sort of metal parts hitting against each other.  Since the box was over the weight limit for first-class mail containing only correspondence, he had reason to believe that the package contained merchandize or contraband, and thus he lawfully could open it.  The warrantless opening of the subsequently-discovered parcels also was supported at a minimum by reasonable suspicion since, in addition to the information possessed by McCoy at the time he opened the first parcel, at the time they were opened the officers now knew that the first box opened contained contraband and the x-raying of the remaining parcels revealed firearms and firearms parts.

invalidated search warrant—in other words, when they act in "good faith." 468 U.S. 897, 922 (1984).   The Court framed the good-faith inquiry as follows: " '[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well[-]trained officer would have known that the search was illegal' in light of 'all of the circumstances.' "   *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23).  In *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987), the Supreme Court applied the *Leon* good-faith exception where officers relied on a statute permitting warrantless administrative searches that was later found unconstitutional.  *See also United States v. Lara*, 588 Fed. Appx. 935,  938-39  (11th Cir. Oct.  20,  2014)  (applying good-faith exception to wiretap warrant issued by judge later found to be outside his jurisdictional authority); *United States v. Steed*, 548 F.3d 961, 969 (11th Cir. 2008) (observing that the good faith exception to the exclusionary rule applies when an officer's reliance on the constitutionality of a statute is objectively reasonable, but the statute is subsequently declared unconstitutional because unless the statute is clearly unconstitutional, the officer could not be expected to question the judgment of the legislature that passed the law) (citing *Krull*, 480 U.S. 340, 349, 356-60).

France argues that the good-faith exception should not apply because the officers did not follow the so-called best practices located in the Appendix to

19 C.F.R. Part 145, contending that those best practices suggest that parcels be x-rayed before opening, and that McCoy testified that he opened the package and then x-rayed it.  However, the Appendix guidance is inapplicable here, since it instructs officers about how to decide whether " 'reasonable cause to suspect' that merchandise   or   contraband   is   contained   in   sealed   letter   class   mail." 19 C.F.R. § Pt. 145, App.  It is not disputed that the packages involved in this case were not letter-class mail; instead they were priority mail parcels all over the 13 oz. first-class mail limitation.  As a result, even if the Appendix was otherwise relevant to the existence of good faith, it is inapplicable here.

Therefore,   for   all   of   the   reasons   stated   above,   the   undersigned **RECOMMENDS** that Defendant France's motion to suppress the fruits of the warrantless search of the five parcel packages, [Docs. 121, 152, 153],  be **DENIED**.

## III.     MOTIONS TO SUPPRESS FRUITS OF SEARCH OF FRANCE'S CELLPHONE(S), [DOCS. 121, 135]

The  parties  present  different  factual  scenarios  as  to  the  circumstances surrounding whatever actions the Government took with regard to one or more of France's cellphones following her arrest on December 14, 2018, in Griffin, Georgia, pursuant to an arrest warrant issued as a result of the return of the Virgin Islands indictment, and before Magistrate Judge King issued Warrant No. 1:8-MC-1924

for France's cellphones and a laptop computer.  As a result, before issuing a Report and Recommendation as to these motions relative to France's cellphone(s), the Court needs to establish the facts surrounding the Government's access to the cellphones' content.  The Court will conduct an evidentiary hearing on these motions on **July 14, 2020, beginning at 10:00 a.m.** in Courtroom 1879, U.S. Courthouse, Atlanta, Georgia.

## IV.  <u>CONCLUSION</u>

In conclusion, for all of the above and foregoing reasons, the undersigned **RECOMMENDS** that be France's motion to suppress the fruits of the search of five parcel post packages, [Docs. 121, 135], be **DENIED**.  The Court will hold an evidentiary hearing on the portions of those motions related to the seizure and search of her cellphones on July 14, 2020 at 10:00 a.m.

**IT IS SO RECOMMENDED and ORDERED**, this <u>  4th  </u> day of <u> May  </u>, 2020.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

23